# EXHIBIT 4

1          **UNITED STATES DISTRICT COURT**
           **MIDDLE DISTRICT OF FLORIDA**
2               **ORLANDO DIVISION**

3                                              :
                                               :
4     **UNITED STATES OF AMERICA**,            :
                                               :        Case Number:
5          Plaintiff,                          :        6:22-cr-00102-WWB-RMN-1
                                               :
6     v.                                       :        Orlando, Florida
                                               :        June 22, 2023
7                                              :        Volume 3 of 3
                                               :        9:02 A.M. - 9:19 P.M.
8     **BRIAN PATRICK DURNING**,               :
                                               :
9          Defendant.                          :
                                               :

10

11              **REDACTED TRANSCRIPT OF JURY TRIAL**
            **BEFORE THE HONORABLE WENDY W. BERGER**
12                **UNITED STATES DISTRICT JUDGE**

13    APPEARANCES:

14    For the Plaintiff:          Michael Felicetta
                                  Courtney D. Richardson-Jones
15                                U.S. ATTORNEY'S OFFICE
                                  400 West Washington Street
16                                Suite 3100
                                  Orlando, Florida 32801
17
      For the Defendant:          Jeremy Lasnetski
18                                LASNETSKI GIHON LAW
                                  121 West Forsyth Street
19                                Suite 520
                                  Jacksonville, Florida 32202
20

21    Proceedings recorded by real-time mechanical stenography.
      Transcript produced by computer-aided transcription.
22

23                   Stenographically reported before:
            Heather Suarez, RDR, CRR, FCRR, FPR-C, WA CCR
                        U.S. Official Court Reporter
24           (407) 801-8921 | heathersuarez.usocr@gmail.com
      401 West Central Boulevard, Suite 4600, Orlando, Florida 32801

25

# T A B L E   O F   C O N T E N T S

**June 22, 2023**
**Volume 3 of 3**

PAGE

ORE TENUS DAUBERT MOTION ...................................4

WITNESSES FOR GOVERNMENT:

    BRIAN PIÑA
    Direct Examination By Mr. Felicetta ...................11
    Cross-Examination By Mr. Lasnetski .....................42
    Redirect Examination By Mr. Felicetta .................48

    DAVID D'ARCANGELIS
    Direct Examination By Ms. Richardson-Jones ...........51
    Cross-Examination By Mr. Lasnetski .....................73
    Redirect Examination By Ms. Richardson-Jones ..........85

REQUEST AS TO DR. TRAMONTIN ................................91

DEFENDANT SWORN .........................................93

COLLOQUY WITH THE DEFENDANT ...............................93

COLLOQUY AS TO DR. TRAMONTIN ..............................98

CHARGE CONFERENCE ......................................112

GOVERNMENT RESTS .......................................138

MOTION FOR JUDGMENT OF ACQUITTAL .........................138

DEFENDANT RESTS ........................................145

MOTION FOR JUDGMENT OF ACQUITTAL RENEWED .................145

CHARGE CONFERENCE (CONTINUED) ............................146

CLOSING ARGUMENTS
    Argument By Mr. Felicetta ...........................152
    Argument By Mr. Lasnetski ...........................177
    Rebuttal Argument By Mr. Felicetta ..................191

CHARGE TO THE JURY ......................................197

```
 1    JURY QUESTION ...........................................217

 2    VERDICT .................................................225

 3    DISCHARGE OF JURY .......................................227

 4    MOTION FOR REMAND .......................................228

 5    CERTIFICATE OF REPORTER .................................231

 6    CERTIFICATE OF REDACTION ................................231

 7

 8                         E X H I B I T S

 9                                           PAGE        PAGE
      GOVERNMENT                           IDENTIFIED  ADMITTED
10
      Number 41A     Body Worn Camera Footage             24
11
      Number 41B     Body Worn Camera Footage             24
12
      Number 41C     Body Worn Camera Footage             24
13
      Number 41D     Body Worn Camera Footage             24
14
      Number 41E     Body Worn Camera Footage             24
15

16

17

18

19

20

21

22

23

24

25
```

| 1 | And I'm -- I'm just trying to -- again, I'm just |
| 2 | trying to work through this as best I can.  I'm not trying to |
| 3 | be difficult or cause frustration for the Court.  If you'd like |
| 4 | me to call, I will step out and call right now. |
| 5 | THE COURT:  Please do. |
| 6 | MR. FELICETTA:  Okay. |
| 7 | (Pause in proceedings.) |
| 8 | MR. FELICETTA:  I couldn't connect, Your Honor.  I |
| 9 | left a message. |
| 10 | THE COURT:  Okay.  All right.  Well, there are |
| 11 | flights.  So -- |
| 12 | Okay.  Let's bring the jury in. |
| 13 | (Jury in at 9:14 A.M.) |
| 14 | THE COURT:  Good morning.  Did anything occur over |
| 15 | the recess that would make it difficult for any of you to |
| 16 | render a fair and impartial verdict in this case? |
| 17 | THE JURY:  No. |
| 18 | THE COURT:  All right.  Call your next witness. |
| 19 | MR. FELICETTA:  Thank you, Your Honor.  The |
| 20 | Government calls Officer Brian Piña, Orlando Police Department. |
| 21 | THE COURT:  Can you raise your right hand for me, |
| 22 | please, sir. |
| 23 | THE WITNESS:  Yes, ma'am. |
| 24 | (Brian Piña sworn.) |
| 25 | THE COURT:  You can have a seat. |

*BRIAN PIÑA | DIRECT*                                              17

1    aircraft.

2    **Q.**    And is that what you did?

3    **A.**    Yes.

4    **Q.**    Where did you position yourself?

5    **A.**    I walked down the jetway, and I did have the ticket -- not

6    the ticket counter but the gate counter -- I stood right there

7    at the gate counter.

8    **Q.**    Did you know or did you have an understanding of what

9    would happen with the male person who was the target of the

10   investigation?

11   **A.**    I'm not sure what you're asking.

12   **Q.**    Where were you going to intercept or talk to this male

13   suspect?

14   **A.**    Yes.   I was going to talk to all parties involved.

15   **Q.**    Okay.   And my question is where were you going to do that?

16   **A.**    Within the same area.

17   **Q.**    Of the gate?

18   **A.**    Yes, sir.

19   **Q.**    But on the terminal side, not on the jetway side?

20   **A.**    Yes, sir.

21   **Q.**    So when you were standing there, at some point did you

22   observe a male who you believed to be involved in this?

23   **A.**    Yes.

24   **Q.**    And how did you know that was the male that was involved?

25   **A.**    They advised me this was the male that's involved.

1    **Q.**   And you said "they."  Who?

2    **A.**   Delta personnel.

3    **Q.**   That individual -- did you have an opportunity to talk to

4    him about what happened that day?

5    **A.**   Yes, I did.

6    **Q.**   And is that person seated in the courtroom today?

7    **A.**   Yes, sir.

8    **Q.**   Do you recognize him?

9    **A.**   Yes, sir.

10   **Q.**   Could you tell the jury where he's seated and point to

11   him.

12   **A.**   He's seated right there next to the defense attorney.

13          **MR. FELICETTA:**  Let the record reflect the witness

14   has pointed to and identified the defendant, Mr. Durning.

15          **THE COURT:**  Let the record reflect the witness has

16   identified the defendant.

17   BY MR. FELICETTA:

18   **Q.**   So whom did you talk to first?

19   **A.**   The defendant.

20   **Q.**   And you had an interaction with him for approximately how

21   long?

22   **A.**   Probably 30 -- 30 seconds maybe.  30 seconds to a minute.

23   **Q.**   And did you tell him what the reason for your involvement

24   there or your presence there was?

25   **A.**   Yes, I did.

*BRIAN PIÑA | DIRECT*                                                    19

1    **Q.**   Can you tell the jury what it is that you told him.

2    **A.**   Yeah.  I told him I was investigating possibly a battery

3    that occurred on the aircraft.

4    **Q.**   And you used the word "battery" a few times.  Let me ask

5    you this:  Is that term "battery" related to some State of

6    Florida offense that you're familiar with under Florida penal

7    code?

8    **A.**   Yes, sir.

9    **Q.**   And can you just -- you know, without getting into the

10   law, but just tell us briefly what your understanding of what

11   "battery" means --

12            **MR. LASNETSKI:**  Objection.  Relevance.

13            **THE COURT:**  Sustained.  You can't tell him -- the law

14   comes from this seat, not that one.

15            **MR. FELICETTA:**  I understand, Your Honor.  I'm just

16   trying to -- well, maybe I can ask it a different way.

17            **THE COURT:**  Rephrase.

18   BY MR. FELICETTA:

19   **Q.**   Without telling us any kind of legal definition or what

20   the penal code is, when you refer to "battery," what are you

21   referring to?  What are you saying?  What conduct are you

22   talking about?

23   **A.**   To touch somebody.

24   **Q.**   Okay.  And when you first interacted with the defendant,

25   were you wearing a body worn camera?

*BRIAN PIÑA | DIRECT*                                            20

1    A.    Yes, sir.

2    Q.    Are these standard issue for the Orlando Police

3    Department?

4    A.    Yes, sir.

5    Q.    And can you tell the jury a little bit about how these

6    body worn cameras operate.

7    A.    So the body worn camera, if you happen to see a video,

8    whenever we activate our camera it goes back one minute prior.

9    So there will be no audio to any of our videos until we hit the

10   button, but it goes back one minute.  So pretty much if you're

11   in a situation, no one usually knows what happens before.

12   Well, they go back one minute prior.  And then once it goes

13   back one minute prior, it'll show one minute prior; and then

14   from when you turned it on, then that's when the audio starts.

15   So if you ever see a video and there's no audio, that's why.

16   It goes back one minute.

17   Q.    You activate the body worn camera?

18   A.    Yes, I have to activate it, sir.

19   Q.    How do you do that?

20   A.    You just have to push the button.  It's a big button.  You

21   just push it.

22   Q.    In this particular case, would it be practice to do that?

23   A.    Yes.  That's our policy.

24   Q.    And when do you not have the camera running?

25   A.    If you're doing any type of police action whatsoever,

*BRIAN PIÑA | DIRECT*                                                      21

1    you're required to have it on per policy.

2    **Q.**    I may have asked it the wrong way, but you're saying when

3    you must have it on is police action.  Can you describe that.

4    **A.**    Yes.  Anything that involves -- anything that's going to

5    be in a report.  Pretty much almost any interaction, we're

6    supposed to turn it on.

7    **Q.**    During the rest of your shift, is it required to be

8    recording at all?

9    **A.**    No, sir.

10   **Q.**    And is there a continuous recording, like the one you

11   described, where it's always capable of recording something

12   until you hit that button?

13   **A.**    Yes, sir.

14   **Q.**    And so when you say it goes back one minute, that's the

15   minute that's captured from the time you hit the button?

16   **A.**    Yes, sir.

17   **Q.**    Did you review Government Exhibit 41 in this case, the

18   body worn camera video that you were -- that you provided?

19   **A.**    Yes, sir.

20   **Q.**    And that video is approximately one hour long; correct?

21   **A.**    Yes, sir.

22   **Q.**    Does Exhibit 41 contain a fair and accurate recording of

23   your interactions with people at Gate 77 between 8:00 A.M. and

24   9:00 A.M. on that day?

25   **A.**    Yes, sir.

*BRIAN PIÑA | DIRECT*                                                              22

1   **Q.**   Excuse me.

2         And at multiple different occasions throughout the time

3   you were at the gate and talking with people, did you have

4   interactions with the defendant?

5   **A.**   Yes, sir.

6   **Q.**   Were you able to review those from the body worn camera

7   exhibit?

8   **A.**   Yes, sir.

9   **Q.**   And do those exhibits, which are 41A, 41C, 41D, and 41E --

10  do those contain a fair and accurate recording of your

11  interaction with the defendant that morning?

12  **A.**   Yes, sir.

13  **Q.**   Did you also speak and interact with other passengers?

14  **A.**   Yes, sir.

15  **Q.**   Did you speak with the victim in this case?

16  **A.**   Yes, sir.

17  **Q.**   And approximately how many times did you speak with her?

18  **A.**   Twice.

19  **Q.**   Can you tell us approximately how long the first

20  conversation was.

21  **A.**   Probably about 30 seconds.

22  **Q.**   And you got some information during that brief interview?

23  **A.**   Yes, sir.

24  **Q.**   And then the second time, did you have an opportunity to

25  speak with her?

1    **A.**   Yes, sir.

2    **Q.**   And how long was that interaction?

3    **A.**   I'd say maybe -- it was longer than the first time.

4    Probably, like, maybe two to five minutes, if not longer.

5    **Q.**   When you interacted with her for the initial interview,

6    the 30-second interview that you talked about, what was her

7    demeanor like?

8    **A.**   She was very upset and crying.

9    **Q.**   And did your body worn camera capture that brief

10   discussion with her?

11   **A.**   Yes, sir.

12   **Q.**   Have you had a chance to review that interaction marked

13   Government Exhibit 41B of your interaction with the child

14   victim?

15   **A.**   Yes, sir.

16   **Q.**   Is that a fair and accurate recording of your interaction

17   with her?

18   **A.**   Yes, sir.

19          **MR. FELICETTA:**  Your Honor, at this time the

20   Government's going to offer Exhibit Numbers 41A, 41B, 41C, 41D,

21   and 41E into evidence.

22          **THE COURT:**  Any objection?

23          **MR. LASNETSKI:**  No objection, Your Honor.

24          **THE COURT:**  All right.  41A, B, C, D, and E will be

25   admitted in evidence.

1          Do you want those admitted as each individual or one

2     composite?

3          MR. FELICETTA:  I don't suppose that -- whatever the

4     Court's preference is.

5          THE COURT:  Regina, how do you want to do that?

6          THE COURTROOM DEPUTY:  However it's labeled.

7          THE COURT:  It's A, B -- so we'll have it as a

8     Composite Exhibit 41A, B, C, D, E, in evidence.

9          MR. FELICETTA:  Thank you, Your Honor.

10         (Government's Exhibit Nos. 41A, 41B, 41C, 41D, and 41E

11    were admitted into evidence.)

12         MR. FELICETTA:  May I have permission to publish

13    these.

14         THE COURT:  You may.

15    BY MR. FELICETTA:

16    Q.   I want to go through these exhibits in chronological order

17    and how they're labeled.  The screen's in front of; so you'll

18    be able to see them.

19    A.   Yes, sir.

20    Q.   I'll play some segments and then ask you some questions.

21         MR. FELICETTA:  Ms. Valente, can you pull up 41A in

22    evidence, and we're going to play just the first 40 seconds of

23    this video.

24         THE COURTROOM DEPUTY:  We're seeing it, but it's

25    not --

1          THE COURT:  I'm not seeing it.

2          THE COURTROOM DEPUTY:  Oh, you're not seeing it

3    either?

4          THE COURT:  No.  Rewind it, and let's get it on

5    everybody's screen.  I can see it's on yours, but it's not on

6    mine.

7          THE COURTROOM DEPUTY:  Hold on.  Let me call IT.

8        (Pause in proceedings.)

9          THE COURTROOM DEPUTY:  Okay.  Now try it.

10         MR. FELICETTA:  Your Honor, I apologize.  Can we have

11   a moment to try to figure out the audio?

12         THE COURT:  Yes.

13         MR. FELICETTA:  This may require a few moments,

14   Your Honor.

15         THE COURT:  Is this 41A?

16         MR. FELICETTA:  Can you pause it for a moment?

17         Yes, Your Honor, it is 41A.  But what we're doing,

18   because 41A is having technical problems, we're playing off 41

19   and just playing the segment that represents 41A.  The audio is

20   distorted on 41A.  We need to correct it.  It's working

21   correctly in our office but not here.

22         THE COURT:  Okay.

23         MR. FELICETTA:  May we proceed?

24         THE COURT:  Yes.

25         MR. FELICETTA:  Okay.

1          Can you pause this, please.

2          Your Honor, I'm sorry.  This audio is not audible.

3    This is not how it sounds.  There's something technically going

4    wrong.

5          **THE COURT:**  Do you need a break?

6          **MR. FELICETTA:**  Yes, please.

7          **THE COURT:**  Ladies and gentlemen, I'll ask you to

8    step into the jury room real quick so this doesn't look like

9    we're changing the set on a play without closing the curtains.

10         (Jury out at 9:35 A.M.)

11         (Pause in proceedings.)

12         **MR. LASNETSKI:**  Your Honor, does my client have time

13   to run to the restroom real quick?

14         **THE COURT:**  You may.  Yes.

15         (Court at ease.)

16         **MR. FELICETTA:**  I think that reboot worked,

17   Your Honor.

18         **THE COURT:**  Okay.  All right.  Ready to bring them

19   back in?

20         **MR. FELICETTA:**  We are, Your Honor.  Yes, Judge.

21         **THE COURT:**  All right.  You want it teed up before we

22   do that?

23         **MR. FELICETTA:**  41A is cued up, Judge.

24         **THE COURT:**  All right.  Let's bring them in.

25         (Jury in at 9:48 A.M.)

*BRIAN PIÑA | DIRECT*                                                                    27

1          THE COURT:  All right.  Ladies and gentlemen, we're

2     going to try again.  Technology is great when it works right.

3     And we've had some upgrades to this courtroom that have ended

4     up being more of a hassle than anything else, but I think that

5     we got IT in there, and it's hopefully -- the sound is going to

6     be better.

7          All right.  You may proceed.

8          MR. FELICETTA:  Thank you, Your Honor.

9          Can we please play the first 40 seconds of 41A.

10    (Exhibit published.)

11    BY MR. FELICETTA:

12    Q.   So your first initial reaction is "What's going on?" and

13    you said something about how "Apparently, you guys were

14    arguing."

15    A.   Yes, sir.

16    Q.   Can you tell the jury what you were referring to and where

17    you got that information.

18    A.   I got that information from the staff -- Delta staff that

19    he had touched Z█ inappropriately.  So at that point that's

20    what I was asking him about.

21    Q.   With respect to "Apparently, you guys were arguing," do

22    you know where that came from?

23    A.   Yes.  He said he didn't know what was going on.

24    Q.   No.  I mean why were you asking that question.

25    A.   Oh, because there was a dispute onboard.

*BRIAN PIÑA | DIRECT*                                                    28

1    **Q.**   All right.  And that's what I'm asking about.

2    **A.**   Yes.

3    **Q.**   Did someone from Delta inform you about some argument

4    onboard?

5    **A.**   Yes.  An altercation that happened on the flight.

6    **Q.**   And the defendant's first response to you when you first

7    encountered him was that he was asleep?

8    **A.**   Yes, sir.

9              **MR. FELICETTA:**  Can you play until 1:28.

10             (Exhibit published.)

11   **BY MR. FELICETTA:**

12   **Q.**   Now, Officer Piña, did this conversation become something

13   notable that you ended up putting in your report?

14   **A.**   Yes, sir.

15   **Q.**   All right.  This first conversation with the defendant --

16   what is it that he's informing you of about angling for a seat?

17   **A.**   He stated him and the mom got into an argument over a

18   seat.

19   **Q.**   Did he tell you in this initial part we just listened to

20   when that argument took place?

21   **A.**   Yes.

22   **Q.**   What did he tell you?

23   **A.**   When they initially got onboard.

24   **Q.**   All right.  So was it your belief, then, as you first

25   started out here, that this all started with a fight over a

*BRIAN PIÑA | DIRECT*                                                    29

1    seat at the beginning of the flight?

2    **A.**   Yes, sir.

3              **MR. FELICETTA:**  All right.  If you could play till

4    two minutes.

5         (Exhibit published.)

6    **BY MR. FELICETTA:**

7    **Q.**   He tells you, "I took a sleeping pill and a glass of wine,

8    and I was out"?

9    **A.**   Yes, sir.

10   **Q.**   So this is the first interaction you have with the

11   defendant, the first person you talk to, and this is how it's

12   framed from his perspective when you first start out?

13   **A.**   Yes, sir.

14             **MR. FELICETTA:**  You can play that till the end of the

15   clip.

16        (Exhibit published.)

17   **BY MR. FELICETTA:**

18   **Q.**   So just let us know, that person at the very end of the

19   clip we saw in uniform -- can you tell us who that is.

20   **A.**   That's Officer Juan Pomales.

21   **Q.**   Is that a colleague of yours?

22   **A.**   Yes, sir.

23   **Q.**   Were you then informing him of what you were investigating

24   there?

25   **A.**   Yes, sir.

BRIAN PIÑA | DIRECT                                                         30

1   **Q.**   When you went and spoke to other officers, did

2   Officer Pomales then stay near the defendant where he was just

3   observed?

4   **A.**   Yes, sir.

5   **Q.**   And was Mr. Durning, the defendant, being detained at that

6   point?

7   **A.**   Yes, sir.

8   **Q.**   Tell us who you went to go speak with next.

9   **A.**   At that point I went and spoke to the witness.

10  **Q.**   When you say "the witness," who are you referring to?

11  **A.**   Could I refer to my report for the name, sir?

12        **MR. FELICETTA:**   I have no objection.   I think for the

13  record, Your Honor, this is Government Exhibit Number 27.

14  **BY MR. FELICETTA:**

15  **Q.**   Take a moment to review that.   Let us know when you've

16  finished reviewing it if that refreshes your recollection.

17  **A.**   Yes, sir.   It was Sharon Joseph.

18  **Q.**   So when you were speaking with Sharon Joseph, did you also

19  have the opportunity to meet with the child victim?

20  **A.**   Yes, sir.

21  **Q.**   And did you talk to them together?

22  **A.**   Yes, sir.

23        **MR. FELICETTA:**   All right.   Can we play the next

24  exhibit, which is 41B.

25        And for purposes of this exhibit, Your Honor, the

*BRIAN PIÑA | DIRECT*                                                     39

1    **A.**   No, sir.

2    **Q.**   All right.  The last clip I want to play is 41E, and I'm

3    just going to -- it's four minutes long, and I'll play it in

4    two segments.  We'll play the first part up until marker

5    52 seconds.

6              **MR. FELICETTA:**  Actually, if you can pause it.

7    BY MR. FELICETTA:

8    **Q.**   I'm sorry.  I failed to address this, but the time on your

9    body camera -- is that an accurate time stamp?

10   **A.**   Yes, sir.

11   **Q.**   So at 8:56, this would have been at the tail end of what

12   you were doing there?

13   **A.**   Yes, sir.

14   **Q.**   And shortly after this at 9:00 is when you turned

15   everything over to the FBI?

16   **A.**   Approximately, yes, sir.

17             **MR. FELICETTA:**  If you could play that again.

18        (Exhibit published.)

19   BY MR. FELICETTA:

20   **Q.**   Now, you respond to him that the allegation is that he ran

21   his leg up the victim's leg and thigh?

22   **A.**   Yes.  His hand.  Yes, sir.

23   **Q.**   Did you know more allegations beyond that at that point?

24   **A.**   Yes, sir.

25   **Q.**   Why didn't you disclose that to the defendant?

| | |
|---|---|
| 1 | coordinator know -- call the number on the summons and let them |
| 2 | know that you served as a juror in this case, and you'll be |
| 3 | excused from service.  If you get a summons and you want to |
| 4 | come back through the process again, then just show up on the |
| 5 | date of your summons.  But you do get a waiver for two years |
| 6 | from jury service in federal court. |
| 7 | But, again, on behalf of all the parties, on behalf |
| 8 | of the Court, the attorneys, everyone involved in this case, I |
| 9 | do want to thank you for your time and your consideration. |
| 10 | Our justice system simply cannot function without |
| 11 | citizens such as yourself that are willing to give of your time |
| 12 | as jurors in cases, and I want to thank you very much for your |
| 13 | service, and we will excuse you at this time. |
| 14 | (Jury discharged at 9:16 P.M.) |
| 15 | THE COURT:  All right.  Mr. Durning is out on bond; |
| 16 | right?  On this case he's on pretrial release; correct? |
| 17 | MR. FELICETTA:  He is, Your Honor.  We're moving for |
| 18 | remand. |
| 19 | THE COURT:  Okay. |
| 20 | MR. LASNETSKI:  Your Honor, we'd ask that the Court |
| 21 | allow him to remain out on the same conditions.  He's been on |
| 22 | pretrial release for a year now.  He's got a monitor.  He's |
| 23 | flown back here from California.  He has abided by the |
| 24 | conditions set by the Court.  He has strong family support and |
| 25 | support from his friends, and we'd ask this Court to just |

1  maintain those conditions pending sentencing.

2         THE COURT:  Any further argument from the Government?

3         MR. FELICETTA:  No, Your Honor.

4         THE COURT:  Is he a resident of Orlando or a resident

5  of California?

6         MR. LASNETSKI:  He is a resident of California, and

7  he's from Orlando with family in Orlando.  So he's been staying

8  here with family for a couple of weeks in preparation for this

9  trial.

10        THE COURT:  Does this count require mandatory remand?

11        MR. FELICETTA:  No, Your Honor.  It's not a mandatory

12  remand.

13        THE COURT:  What's the -- let me look at the --

14        MR. FELICETTA:  His guidelines are between three and

15  four years, I believe, since there's no acceptance of

16  responsibility.

17        I could tell you that the defendant has abided by the

18  terms of pretrial supervision with the exception of one

19  incident.  There was a violation filed in August of last year.

20  That violation occurred shortly after he was arrested and

21  released.  That had to do with an incident in a restaurant

22  where he apparently consumed too much alcohol and got into a

23  physical altercation with his then-girlfriend.  The probation

24  department recommended that they change the conditions from

25  abstaining from excessive alcohol to no alcohol, and since then

1

**CERTIFICATE OF REPORTER**

2    I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-titled matter.

3

4    _____
     Heather Suarez, RDR, CRR, FCRR, FPR-C, WA CCR
5    U.S. Official Court Reporter
     United States District Court
6    Middle District of Florida

7    Date:   09/11/2023

8

9                              -oOo-

10                  **CERTIFICATE OF REDACTION**

11   I certify that the foregoing is a true and correct copy of the
     transcript originally filed with the clerk of court on
12   09/11/2023 and incorporating redactions of personal
     identifiers, in accordance with Judicial Conference policy.

13

     Redacted characters appear as a black box in the transcript.
14

15
     _____
16   Heather Suarez, RDR, CRR, FCRR, FPR-C, WA CCR
17   U.S. Official Court Reporter
     United States District Court
18   Middle District of Florida

19   Date:   09/11/2023

20

21

22

23

24

25